**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **PEGGY COLEMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:06CV00066 |
| v. | ) | |
| | ) | **OPINION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | By: James P. Jones |
| **SOCIAL SECURITY,** | ) | Chief United States District |
| | ) | Judge |
| Defendant. | ) | |

*Joseph E. Wolfe, Wolfe, Williams & Rutherford, Norton, Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, Michael McGaughran, Regional Chief Counsel, and Patricia M. Smith, Assistant Regional Counsel, Region III, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Peggy Coleman filed this action under 42 U.S.C.A. § 1383(c)(3) (West 2003 & Supp. 2007) challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act ("Act"). 42 U.S.C.A. §§ 1381-1383(f).

My review under the Act is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision. If substantial

evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff originally applied for SSI on November 17, 1998, alleging disability since March 11, 1993, due to nervousness, a hyperactive thyroid, migraine headaches, and lung problems. (R. at 77-79, 83.) This claim was denied on February 17, 1999, and upon reconsideration on April 27, 1999. (R. at 61-62, 65-66.)

The plaintiff requested a hearing before an administrative law judge ("ALJ") (R. at 67) and the hearing was held on September 22, 1999. (R. at 38-56.)

By decision dated March 31, 2000, the ALJ denied the plaintiff's claim for SSI. (R. at 15-21.) On September 17, 2002, the plaintiff filed a complaint in this court seeking review of the decision below. The Commissioner filed a Motion to Remand the case in order for the ALJ to a hold a supplemental hearing to consider additional evidence, to obtain testimony from a vocational expert, and to issue a new opinion. (R. at 378-79.) Without objection from the plaintiff, the case was remanded to the Commissioner on April 20, 2003, for further proceedings. (R. at 377.)

On November 19, 2003, the ALJ held a hearing where the plaintiff and a vocational expert testified. (R. at 350-74.) By a decision dated December 23, 2003, the ALJ denied the plaintiff's claim for SSI finding that the plaintiff's capacity for light work had not been significantly compromised by her non-exertional limits. (R. at 320-28.) On January 26, 2004, the plaintiff requested review of the ALJ's decision from the Appeals Council. (R. at 315-16.) On June 24, 2004, the case was remanded by the Appeals Council and by its order the case was assigned to another ALJ for review. (R. at 384-88.)

On April 26, 2005, a third hearing was held before a different ALJ. (R. at 330-49.) This ALJ further developed the record prior to his decision in the case by obtaining consultative examinations by a psychiatrist and a psychologist. By decision dated May 9, 2005, this ALJ found that the plaintiff was not under a disability. (R. at 304-12.) Although he found that she had severe impairments of obesity and borderline intellect, and non-exertional mental limitations, he found that she retained the ability to perform a limited range of light work. (R. at 311-12.) The plaintiff requested review from the Appeals Council and review was denied on September 27, 2006. (R. at 292-94.) On November 7, 2006, the plaintiff filed a complaint in this court appealing the May 9, 2005 decision of the ALJ. The plaintiff alleges that (1) the ALJ failed to give proper weight to the opinions of her treating

-3-

physician and (2) the ALJ erred in his evaluation of the plaintiff's mental impairments.

## II

The summary judgment record reveals the following facts. The plaintiff was born on April 5, 1962, and was forty-three at the time of the ALJ's decision. (R. at 308.) She completed the tenth grade of high school. (*Id*.) The record indicates that the plaintiff has no past relevant work experience.

The plaintiff's past surgical history includes an appendectomy, a hysterectomy, and a thryroidectomy. (R. at 497.)

The plaintiff alleges that she is disabled in part due to a hyperactive thyroid. She was diagnosed with Graves disease in November 1996. The plaintiff was treated by Jeffrey D. Neill, M.D., for this condition. (R. at 129-141.) In order to treat this condition, her thyroid was removed and she was administered radioactive iodine. (R. at 133-34, 140-41, 267-74, 276-77.) Although this condition requires her to take synthetic thyroid hormone replacement, the ALJ determined from the plaintiff's medical records that she had no documented limitations or severe residuals related to this condition. (R. at 308.)

-4-

From September 25, 1997, to April 12, 1999, the plaintiff was treated by Dr. Vinod Modi for cystitis, bronchitis, sinusitis, bilateral knee pain, weakness, nervousness, back pain, bilateral arm pain, bilateral hip pain, anxiety, wheezing, and heartburn. (R. at 142-161.) The plaintiff was hospitalized from October 13, 1997, to October 16, 1997, due to persistent left lower quadrant pain. (R. at 162-170.) During this hospital stay she underwent a diagnostic laparoscopy, a laparotomy, and a total abdominal hysterectomy. (*Id*.)

The record indicates that the plaintiff has had respiratory difficulty on multiple occasions. The plaintiff was hospitalized three times in 1998 for acute bronchitis. (R. at 190-206.) The record also indicates that the plaintiff sought emergency room treatment for acute bronchitis on February 21, 2005. (R. at 534-42.) Although the plaintiff has complained of occasional episodes of respiratory distress and listed it as a basis for her alleged disability, she testified in November 2003 that she typically smoked two to three packs of cigarettes per day. (R. at 361.)

On January 20, 1999, the plaintiff underwent a consultative examination by German Iosif, M.D., a pulmonary specialist. Dr. Iosif indicated that the plaintiff's chief complaint was exertional dyspnea that she experienced when walking and climbing two flights of stairs. (R. at 220.) Dr. Iosif noted that the plaintiff, who was thirty-six years old, was morbidly obese, thus appearing older than her stated age.

-5-

(R. at 221.)  He also indicated that the plaintiff was prone to frequent bursts of coughing, which in turn triggered an audible wheeze.  (*Id.*)  The plaintiff was diagnosed with chronic bronchitis and possible asthma.  (*Id.*)  Although Dr. Iosif noted that the degree of the plaintiff's respiratory functional impairment appeared mild, it could fluctuate to more significant severity.  (*Id.*)

The record next indicates that the plaintiff sought treatment for her respiratory condition some three years later.  On January 3, 2003, the plaintiff was seen by Sharat K. Narayanan, M.D.  (R. at 417-18.)  Upon examination, Dr. Narayanan reported that the plaintiff's lungs were clear, but that she had bronchitis and sinusitis.  (R. at 418.)  The plaintiff was prescribed antibiotics and advised to continue her current inhaler treatment.  (*Id.*)

On December 18, 2003, Dr. Robert Gaudet ordered a chest X ray of the plaintiff.  (R. at 454.)  This radiograph revealed interstitial changes with no acute pulmonary pathology.  (*Id.*)

The plaintiff was hospitalized on November 11, 2004 due to swelling in the umbilical region associated with pain.  (R. at 497-99.)  She underwent an incisional hernia repair that was successful.  (R. at 500.)

The medical records fail to document that the plaintiff has a musculosketal impairment.  In May 2002,  X rays of her hip showed only mild osteoarthritis.  (R. at

-6-

433.)  Additionally, X rays of her knee taken in June 2003 revealed only mild osteoarthritis with no other abnormality.  (R. at 431.)  On January 30, 2004, X rays taken of the plaintiff's lumbar spine revealed mild degenerative changes.  (R. at 470.)  Furthermore, on April 6, 2004, a Magnetic Resonance Imaging ("MRI") taken of the lumbar spine indicated that there was no disc herniation or stenosis, although it did show that there were some degenerative changes in the lower spine at L5-S1.  (R. at 468-69.)  Based on these objective diagnostic procedures, the ALJ concluded that the plaintiff did not have a severe musculosketal impairment.  (R. at 308-309.)

The record also documents the plaintiff's mental health treatment.  Although the plaintiff claims to be disabled due to nerve problems, her records indicate that she has not been hospitalized for this problem or for any form of mental illness.  From the record, it appears that the plaintiff was treated by Dr. Modi from September 25, 1997, to April 12, 1999, for some complaints of nervousness and anxiety.  (R. at 142-161.)  It also appears that the plaintiff has been treated for depression.  (R. at 178.)

On October 26, 1999, the plaintiff underwent a consultative psychological examination by B. Wayne Lanthorn, Ph.D.  (R. at 243-53.)  On intelligence testing, the plaintiff was given the Wechsler Adult Intelligence Scale Third Edition ("WAIS-III") and received a verbal IQ score of seventy-one, a performance IQ score of seventy, and a full scale IQ score of sixty-eight.  (R. at 243.)  Dr. Lanthorn diagnosed

-7-

the plaintiff with dysthymic disorder, panic disorder without agoraphopia, and borderline intellectual functioning. (R. at 248.) Dr. Lanthorn determined that the plaintiff had a Global Assessment of Functioning ("GAF") score of sixty. (*Id.*) He also noted that the plaintiff's capacity for understanding was intact, although he believed that anxiety, panic, general attention levels, and dysthymia may affect her cognitive abilities at times. (*Id.*) She was found to be able to sustain concentration and to persist in a task reasonably well. (R. at 249.)

On May 29, 2002, Dr. Narayanan, the plaintiff's treating physician for her thyroid disorder, completed a mental and physical capacity assessment form that was presented to him by the plaintiff's attorney. (R. at 285-91.) On the physical capacity form, he indicated that the plaintiff could lift a maximum of five pounds occasionally, and stand, walk, or sit two hours at a time and half an hour without interruption. (R. at 286-87.) Dr. Narayanan pointed generally to the plaintiff's past medical history as the basis of this assessment, and he made no attempt to support this limitation based on clinical or diagnostic findings. (R. at 287-88.) On the plaintiff's mental capacity assessment, Dr. Narayanan indicated that the plaintiff had "poor/none" ability to make occupational adjustments, performance adjustments, and personal-social adjustments, and a fair ability to maintain personal appearance and relate predictably in social situations. (R. at 290.)

-8-

On October 16, 2003, the plaintiff sought treatment from Dr. Narayanan. The plaintiff complained of anxiety and heart palpitations. (R. at 514-15.) The plaintiff was prescribed ten tablets of Xanax and was counseled on the benefits of diet and exercise. (R. at 515.)

In order to develop the record on the plaintiff's mental health issues, the ALJ requested that the plaintiff be evaluated by a psychiatrist and a psychologist.

On October 8, 2004, the plaintiff underwent a psychiatric evaluation conducted by Minaben D. Patel, M.D. (R. at 473-77.) Prior to this appointment, the plaintiff had never seen a psychiatrist for treatment, although she saw a counselor for one year. (R. at 474-75.) Dr. Patel observed that her affect was appropriate to her ideation. (R. at 476.) He found that her speech was logical, coherent, and relevant, and he saw no evidence of psychosis. (*Id*.) The plaintiff denied any active suicidal or homicidal ideation and did not report any hallucinations or delusions. (*Id*.) Dr. Patel diagnosed the plaintiff with dysthymic disorder and generalized anxiety disorder. (*Id*.) Dr. Patel assessed the plaintiff as having GAF score of sixty. (*Id*.)

He found that the plaintiff had a good ability to follow work rules, understand, remember and carry out simple job instructions, and maintain personal appearance; a fair ability to relate to co-workers , use judgment, interact with supervisors, function independently, maintain attention and concentration, behave in an emotionally stable

manner, relate predictably in social situations, and demonstrate reliability; a poor ability to deal with the public and work stresses, and to understand, remember and carry out complex instructions. (R. at 478-79.)

On December 14, 2004, the plaintiff was again examined by Dr. Lanthorn at the request of the ALJ. (R. at 481-90.) Dr. Lanthorn noted that the plaintiff's affect was appropriate and within the normal range of expression. (R. at 483.) Although the plaintiff reported being depressed and experiencing anxiety, Dr. Lanthorn found that she showed virtually no signs of either. (*Id*.) The plaintiff's communication skills were clear and intact. (R. at 486.) On intelligence testing, Dr. Lanthorn noted that on the WAIS-III test the plaintiff achieved a Full Scale score of seventy-four, which placed her in the borderline range of current intellectual functioning. (R. at 484.) Dr. Lanthorn also found that the plaintiff demonstrated no difficulties with memory, concentration, ability to persist, and no specific problem in her abilities to attempt to solve testing items in a methodical and successful fashion. (R. at 486.) Dr. Lanthorn concluded that the plaintiff had dysthymic disorder and panic disorder without agoraphobia. (R. at 485.) He also assessed her GAF score to range between sixty-five and seventy. (*Id*.)

In terms of the plaintiff's mental capacity to do work-related activities, Dr. Lanthorn indicated that the plaintiff had an unlimited ability to understand, remember,

and carry out simple job instructions; a good ability to follow work rules, maintain personal appearance, and understand, remember and carry out detailed job instructions. (R. at 487, 489.) He noted that she had a fair ability to relate to co-workers, use judgment, interact with supervisors, function independently, maintain attention and concentration, understand, remember and carry out complex instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (*Id*.) He further concluded that she only had a poor ability in the areas of dealing with work stresses and dealing with the public. (*Id*.)

At the April 26, 2005 hearing before the ALJ, vocational expert Donna J. Bardsley testified. (R. at 343-48.) Bardsley testified that a hypothetical individual of the plaintiff's height, weight, education, and work background that had the physical capacity to perform sedentary, light, and medium work, and who had restrictions similar to those outlined in Dr. Lanthorn's 2004 mental assessment of the plaintiff (R. at 481-90.) would be able to perform a number of jobs present in the national economy. (R. at 344.) In particular, Bardsley testified that such a person could perform the jobs of hand packager, sorter, assembler, inspector, and food service related occupations. (*Id*.)

-11-

Bardsley also considered the limitations found by Dr. Patel in his assessment of the plaintiff. Bardsley believed a person with such limitations could still perform the same jobs. (R. at 345.)

Finally, Bardsley testified that if an individual had the restrictions contained in Dr. Narayanan's 2002 report, that there would be no jobs such a person could perform in the national economy. (*Id.*)

III

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g). *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences, in the evidence. It is not the role of the court to substitute its judgment for that of the Commissioner, so long as substantial evidence provides

-12-

a basis for the Commissioner's decisions.  *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Commissioner applies a five-step sequential evaluation process when assessing an applicant's disability claim.  The Commissioner considers, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment or combination of impairments; (3) had a condition which met or equaled the severity of a listed impairment; (4) could return to her past relevant work; and (5) could perform other work present in the national economy.  *See* 20 C.F.R. § 404.1520(a)(4) (2007).   If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases.  *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

The plaintiff argues that the ALJ failed to give proper weight to the opinions of Dr. Narayanan, a treating physican.  A treating  physician's opinion is entitled to more weight than the opinion of a non-treating physician but it is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2) (2007); *see Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by

clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").

The ALJ is required to consider a number of factors when determining what weight to give the treating physician's opinion, such as the scope and frequency of any examining relationship; the length, nature and extent of the treatment; the objective evidence supporting the opinion; and the opinion's consistency with the medical record as a whole. *See* 20 C.F.R. §§ 404.1527(e)(2)-(e)(3), 416.927(e)(2)-(e)(3) (2007).

Although Dr. Narayanan's opinions may be entitled to more weight than those of a non-treating physician, his opinions should be credited only to the extent of their "intrinsic value, persuasiveness, and internal consistency" and their consistency with other evidence. 56 Fed. Reg. 36934-35 (Aug. 1, 1991), *see Johnson v. Barnhart,* 434 F.3d 650, 654-55 (4th Cir. 2005).

Here, the ALJ's failure to fully credit Dr. Narayanan's opinions regarding the plaintiff's physical limitations or her mental impairments is of little consequence. Dr. Narayanan opined that the plaintiff could not perform the exertional requirements of light work. (R. at 311.) *See* 20 C.F.R. § 404.1567(b) (2007) (defining light work as the ability to carry or lift objects up to ten pounds frequently and a "good deal of walking or standing" or "sitting most of the time with some pushing or pulling").

-14-

However, the plaintiff indicated that her activities include making her own bed, doing laundry, washing dishes, driving, grocery shopping, assisting in housework, preparation of meals, and quilting. (R. at 115-16, 338, 366, 370.) The plaintiff also testified that she would have no problem lifting ten pounds at one time. (R. at 363.) The plaintiff's reported activities are inconsistent with the restrictions found by Dr. Narayanan. Furthermore, the plaintiff testified that she had an ability to lift an amount of weight greater than that which Dr. Narayanan said she could lift. In light of these inconsistences between Dr. Narayanan's findings and the plaintiff's admissions regarding her own abilities, the ALJ was not required to credit Dr. Narayanan's opinions.

The ALJ also noted that Dr. Narayanan's May 29, 2002 assessment regarding the plaintiff's ability to perform both physical and mental work-related activities was not based on any objective clinical observations or laboratory results. (R. at 325.) Dr. Narayanan reported that the only basis of this assessment was the plaintiff's history. (*Id*.)

In determining whether substantial evidence supports the Commissioner's decision, I must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir.

1997). Considering this requirement, I find that the ALJ was entitled to reject the assessment of Dr. Naryanan, as it was not based on objective medical evidence and it conflicted with the plaintiff's own reported activities and abilities.

The plaintiff further argues that the ALJ was required to recontact Dr. Narayanan prior to rejecting his opinions. This argument holds little merit.

An ALJ must recontact a physician when the evidence received from that physician is inadequate to determine whether a claimant is disabled. 20 C.F.R. § 404.1512(e) (2007). The regulations state that the additional contact should occur where the report from the treating physician contains a conflict or ambiguity, lacks necessary information, or does not appear to be based on medically acceptable clinical and diagnostic techniques. *Id.*

The fact that the ALJ gave little weight to the opinions of Dr. Naryanan does not mean he had a duty to seek additional information in an attempt to find such opinions credible. As the plaintiff points out, "the ALJ generally has an affirmative obligation to develop the administrative record" and "[t]his duty exists even when the claimant is represented by counsel." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The ALJ fulfilled this duty by seeking assessments from both a psychiatrist (Dr. Patel) and a psychologist (Dr. Lanthorn). As there was no internal conflict in Dr. Naryanan's treatment notes that could have been cured or ambiguity that could have

Case 2:06-cv-00066-JPJ-PMS   Document 17   Filed 10/22/07   Page 16 of 21   Pageid#: 84

been clarified through any subsequent contact with the treating physician, the ALJ complied fully with the requirements of 20 C.F.R. § 404.1512(e).

Even had the ALJ been required to recontact Dr. Naryanan before rejecting his opinion, the plaintiff has made no showing of prejudice. *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (explaining that a claimant must show that additional evidence would have been produced by recontact with treating physician, and that it would have led to a different decision). "Prejudice can be established by showing that additional evidence would have been produced . . . and that the additional evidence might have led to a different decision." *Ripely v. Chater*, 67 F.3d 552, 557 n.22 (5th Cir. 1995). Accordingly, any error in failing to comply with the regulations was merely harmless. *See Camp v. Massanari*, 22 F. App'x 311, 311 (4th Cir. 2001) (unpublished).

IV

Finally, the plaintiff argues that the ALJ erred in his evaluation of the plaintiff's mental impairments. After carefully reviewing the record, I find that this argument is without merit and that there is substantial evidence in the record to support the ALJ's finding on this issue. The plaintiff saw a counselor for one year, several years ago. (R. at 476-77.) However, she has not sought the services of a

-17-

mental health specialist or center despite recommendations that she do so. (R. at 249, 477, 486.)

The record provided substantial evidence to support the ALJ's finding that the plaintiff does not have a severe, ongoing mental impairment that has continued for twelve months. Specifically, the additional evaluations sought by the ALJ regarding the plaintiff's mental impairments provided substantial evidence that the plaintiff has the mental capacity to perform unskilled light work. As stated above, the court's role in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. Where there is substantial evidence to support the finding below, this court may not substitute its judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. My job is not to review the evidence de novo, but simply to determine whether there was sufficient evidence to support the finding. This is done by analyzing the record and determining whether the ALJ sufficiently articulated his findings and his rationale in crediting the evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40.

In order to fully develop the record in this case, the ALJ requested mental evaluations of the plaintiff from Drs. Patel and Lanthorn. Dr. Patel diagnosed the plaintiff with a dysthymic disorder and a generalized anxiety disorder and assessed the plaintiff as having a GAF score of sixty. (R. at 476.) Such a score indicates only

-18-

moderate symptoms or moderate difficulty in social or occupational functioning. Am.

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.

1994) ("*DSM IV*").

Dr. Patel determined that the plaintiff had a good ability to follow work rules,

understand, remember and carry out simple job instructions, and maintain personal

appearance; a fair ability to relate to co-workers, use judgment, interact with

supervisors, function independently, maintain attention and concentration,

understand, remember and carry out detailed instructions, behave in an emotionally

stable manner, relate predictably in social situations and demonstrate reliability; and

a poor ability to deal with the public and work stresses, and to understand, remember

and carry out complex instructions. (R. at 478-79.)

Bardsley, the vocational expert, was specifically asked to consider the

limitations found by Dr. Patel and consider whether an individual with such

limitations could perform work. She testified that a person with the limitations

enumerated by Dr. Patel could perform the jobs of hand packager, sorter, assembler,

inspector, and food service related occupations. (R. at 345.)

The plaintiff was also examined by Dr. Lanthorn. On intelligence testing, Dr.

Lanthorn noted that the plaintiff achieved a score which placed her in the borderline

range of current intellectual functioning. (R. at 484.) Dr. Lanthorn also found that

Case 2:06-cv-00066-JPJ-PMS   Document 17   Filed 10/22/07   Page 19 of 21   Pageid#: 87

the plaintiff demonstrated no difficulties with memory, concentration, ability to persist, and no specific problem in her abilities to attempt to solve testing items in a methodical and successful fashion. (R. at 486.) Dr. Lanthorn concluded that the plaintiff had a dysthymic disorder and a panic disorder without agoraphobia. (R. at 485.) He also assessed her GAF score to be between sixty-five and seventy, which indicates mild symptoms or some difficulty in social or occupational functioning. *DSM IV* at 32.

In terms of the plaintiff's mental capacity to do work-related activities, Dr. Lanthorn opined that the plaintiff had an unlimited ability to understand, remember, and carry out simple job instructions; and a good ability to follow work rules, maintain personal appearance, understand, remember and carry out detailed job instructions. (R. at 487, 489.) He further concluded that she only had a poor ability in the areas of dealing with work stresses and dealing with the public. (*Id*.)

Bardsley considered the limitations found by Dr. Lanthorn and found that there were jobs in the national economy that the plaintiff could perform. In particular, she found the limitations Dr. Lanthorn imposed as a result of the plaintiff's mental impairments would not prevent her from performing the jobs of hand packager, sorter, assembler, inspector, and food service worker. (R. at 344.)

-20-

Although the plaintiff testified at the hearing that she suffers from anxiety and depression, that she cannot deal with the public, and that she has severe mood swings coupled with crying spells, the ALJ was entitled to conclude that any mental impairment she possessed was not disabling based on the evaluations provided by Dr. Lanthorn and Dr. Patel. These evaluations provided substantial evidence to support the ALJ's findings in this case relating to the plantiff's alleged mental impairments.


V

For the aforementioned reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered.


DATED: October 22, 2007

 /s/ JAMES P. JONES
Chief United States District Judge

-21-